UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| In re: | |
|---|---|
| Jeri Sharron Humphrey, | Case No. 23-22884-rmb |
| Debtor. | Chapter 7 |

| Sean Huebner | |
|---|---|
| Plaintiff, | Adversary No. 23-02112-rmb |
| v. | |
| Jeri Humphrey | |
| Defendant. | |

## POST-TRIAL DECISION

Sean Huebner brought this adversary against pro se defendant Jerri Humphrey, seeking a declaration that a debt owed to him for Humphrey's alleged misrepresentations in connection with the sale of residential real estate is not dischargeable under 11 U.S.C. § 523(a)(2)(A). The Court held a trial on April 29, 2024, during which the Court heard testimony from several witnesses and admitted several exhibits in evidence. Having reviewed the evidence, the Court concludes that Humphrey owes a debt to Huebner for a misrepresentation related to water problems in the kitchen dinette ceiling, and that the debt is not dischargeable.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). *See* 84-1 Order of Reference (E.D. Wis. July 10, 1984) (available at https://www.wieb.uscourts.gov/general-orders) (last accessed September 30, 2024). Determination of the dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I). To the extent the determination of

dischargeability requires consideration of issues impacted by the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), the parties have consented to the bankruptcy court's final adjudication of these issues by their silence. *See* Fed. R. Bankr. P. 7008, 7012; *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683 (2015) ("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express."). This decision constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

This case involves Humphrey's sale of a house on Toronto Street in Milwaukee, Wisconsin to Huebner in 2022. The primary question is whether Humphrey misrepresented the condition of the house by failing to disclose defects related to water intrusion in the living room, basement, and kitchen.

Humphrey purchased the property in 2017 and used it as her primary residence until 2022 when she sold it to Huebner. Humphrey testified that she made minor, cosmetic changes to the house while she lived there, such as painting certain rooms and extending the downspouts. She said she did not paint the kitchen or the basement. Humphrey denied ever repairing drywall or plaster, denied noticing any mold or mildew in the basement, and generally denied that she ever experienced water intrusion or leaking in any area of the house.

Humphrey's real estate agent, Tiffany Griffin, testified that she walked through the house before listing it for sale. She said she did not see any evidence of water staining on the ceiling in the kitchen or living room or any evidence of water damage in the basement.

As part of the sale to Huebner, Humphrey signed and provided Huebner with a Real Estate Condition Report (RECR) in February of 2022 as required by Wis. Stat. § 709.03. The RECR is structured as a series of yes-or-no questions that ask whether the seller is aware of

certain defects in the property. Ex. 1.[1]  It defines the term "aware" as "hav[ing] notice or knowledge." *Id.* at 1.  It defines the term "defect" as "a condition that would have a significant adverse effect on the value of the property; that would significantly impair the health or safety of future occupants of the property; or that if not repaired, removed, or replaced would significantly shorten or adversely affect the expected normal life of the premises." *Id*.  Humphrey answered either "No" or "N/A" to all the questions, including answering "No" the following questions relevant to this case:

> B1: Are you aware of defects in the roof?
> B7: Are you aware of defects in the basement or foundation (including cracks, seepage, and bulges)?
> B8: Are you aware of defects in any structure on the property?
> B11: Are you aware of basement, window, or plumbing leaks, overflow from sinks, bathtubs, or sewers, or other ongoing water or moisture intrusions or conditions?

*Id*. at 2.

Sean Huebner and his wife, Lauren Tatum, toured the house late February or early March 2022.  They noticed some issues with the house that were plainly visible, such as the cracked garage floor and an issue with a loose railing.  They did not notice any evident water issues.  Tatum described the ceiling in the kitchen as "pristine," and neither Huebner nor Tatum noticed any water spots or stains on any ceiling in the house.  They also did not notice any water damage in the basement, which was finished on one side and unfinished on the other.  Nor did the basement smell musty or damp, as they would have expected if there were water issues in the basement.

Huebner and Tatum offered to purchase Humphrey's home on March 2, 2022 for $170,000 contingent upon a satisfactory inspection and their ability to obtain financing. Ex. 2.

---

[1] References to exhibits are to the numbered exhibits admitted into evidence at trial.

The day after submitting the offer to purchase, the couple countersigned the RECR, acknowledging receipt of the document and the disclosures therein. Humphrey accepted their offer.

Huebner and Tatum retained home inspector Scott Festge from Milwaukee Homesight Inc. to inspect the property. The inspection was conducted on March 4, 2022, and Festge produced a 70-page report detailing his findings and recommendations. Ex. 3. Festge identified defects with and made recommendations for almost every area inspected, noting a range of issues from common wear and tear to major health hazards. The following observations in Festge's report are relevant to this case:

- Festge noted that a walkway on the southeastern side of the house was settled toward the structure, and stated that "damage, leaks and/or safety hazards may exist." Ex. 3 at 11.

- Festge noted that the "[s]iding/trim appears to have issues" and that there may be "moisture/seepage/damage." *Id*. at 12-13.

- Festge noted damaged shingles on the roof that may cause "water penetration." *Id*. at 19.

- Festege noted signs of possible microbial growth evidence of past water intrusion in the basement. *Id*. at 52.

- Festge could not evaluate the condition of the home's drain tile system, but recommended the buyers "[c]onsult owner to confirm a dry basement." *Id*. at 49.

Huebner was present for part of the inspection, and at trial recalled that Festge pointed out a grading issue with the concrete walkway at the southeast corner of the house. Huebner testified that his understanding of the defect was that the grading would cause water to sit against the house, which was not good for the foundation. Huebner did not recall discussing any other specific issues with the inspector.

Based on the defects noted in the inspection report, Huebner and Tatum submitted an Amendment to the Offer to Purchase which required Humphrey to make certain repairs. Ex. 4. The repairs they requested were related to obvious safety hazards that they prioritized because they would be moving into the home with their young children. The Amendment did not request repairs to the roof, the grading around the house, or the potential microbial growth in the basement. *Id*. The Amendment did request that certain loose or missing siding on the property be fixed, but both Huebner and Tatum testified at trial that all repairs were completed to their satisfaction. There is no evidence in the record that Huebner or Tatum requested additional information about past water intrusion in the basement.

The sale closed in early April 2022. Huebner ultimately purchased the property in his name only. Tatum's student loans affected the underwriting calculations for the mortgage loan, so the couple decided that Huebner would purchase the property himself so they could obtain a loan with better terms.

Huebner and Tatum started experiencing issues with water intrusion shortly after closing. On April 22, 2022, they noticed a strong, musty smell in the basement and discovered the carpet in the finished side of the basement soaked through with water. They could not identify the cause of the leak but noted its origin at the southeastern corner. They removed a portion of the drywall in that area and discovered evidence that water was been seeping down the concrete foundation wall and under the drywall and trim. Huebner and Tatum testified that following the initial incident, water would seep into the basement during most rain events.

On September 9, 2022, Robert Vorbau of A1 Foundation Inspections inspected the basement. Ex. 7. Vorbau noted signs of reoccurring water seepage at the southeastern corner of the basement that had likely been ongoing for several years. The concrete wall had staining

indicative of the presence of water over time that had been dripping from the top of the concrete wall. In addition, the electrical conduit was severely eroded in that corner, and Vorbau said it takes 5-10 years of regular water presence to erode conduit like that. Vorbau said that he expected the drywall might be damaged in that area, but that the drywall and trim did not appear to have any significant water damage. Vorbau pinpointed the likely cause of seepage as the concrete walkway in the southeastern corner of the home which was "excessive[ly] pitch[ed] toward the foundation allowing water to pool in the area and seep into the foundation." Ex. 7 at 2. Vorbau also noted that the northwest corner of the basement showed signs of reoccurring seepage, which could be caused by the flat grade along the exterior wall and the lack of a downspout extension.

To try to mitigate the leaking in the southeast corner, Huebner and Tatum set sandbags at the corresponding exterior wall of the house, and patched the area with a tarp, tar, and foam. They still see some water in the basement during heavy rain, but their efforts seem to have slowed the leaking. Eventually they will need to invest in major, professional repairs to have the area properly graded and the foundation fixed.

Huebner and Tatum also experienced a major leak in the kitchen dinette in the summer of 2022. This area is a "bump-out" from the main kitchen with a bay window. It has a separate, small roof line connected to the side of the house. The exterior of the area is visible in the Festge inspection report in the upper right photo on page 13 and in the left photo in the third row on page 18. *See* Ex. 3 at 13, 18.

During a storm that occurred on June 15, 2022, Tatum noticed water dripping from the ceiling in the dinette area. Rainwater leaked into a light fixture in the middle of the area and dripped from the ceiling. Tatum took a video during the storm showing the leak. Ex. 14. The

6

leak left a puddle of water in the light fixture and caused significant damage to the ceiling paint and drywall. Exs. 8, 9, 10, 11, 12.

On July 11, 2022, there was another significant rain event that caused rainwater to leak in that area. Tatum took a video showing water dripping from the entire ceiling. Ex. 15. The leak was so bad that it appeared as though it was raining inside of the house.

Huebner and Tatum determined themselves that the source of the leak was the seam between the siding and the kitchen bump-out roof. Tatum used a can of expanding foam in the seams above the roof and windows in that area. She said that they have not experienced any leaking from the ceiling since she made that repair, but that they will eventually need to have the entire area professionally repaired.

After she filled the seam outside, Tatum repaired the interior ceiling herself. She said that it appeared the drywall had been patched at some point because she could see the mesh drywall patch when she removed the damaged portions of the paint, drywall, and plaster. The patch spanned the entire width of the ceiling in that area.

Finally, Huebner and Tatum testified to a crack and a water spot that appeared on the ceiling in the living room about a year after closing. *See* Ex. 13. Tatum testified to noticing the crack shortly after moving into the home, although she did not notice water seepage through it until the spring or summer of 2023. They did not present any evidence as to the source of the problem, and they have not taken any action to repair or mitigate whatever caused the crack or staining.

Huebner brought a civil action against Humphrey in Milwaukee County, Wisconsin Circuit Court on May 16, 2023, raising several claims relating to alleged misrepresentations

Humphrey allegedly made in the RECR. That action was stayed when Humphrey filed a chapter 7 bankruptcy petition on June 26, 2023.

## DISCUSSION

The Bankruptcy Code excepts from discharge debts "obtained by . . . false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). There must exist an underlying pre-petition debt before the debt can be rendered nondischargeable under § 523(a)(2)(A). *In re McClure*, 625 B.R. 733, 738 (Bankr. C.D. Ill. 2021) ("Section 523(a)(2) does not provide a creditor with a cause of action that simultaneously creates a debt and renders it non-dischargeable.") (internal quotation omitted).

Humphrey disputes that she owes a debt to Huebner, and she argues that any debt she may owe is dischargeable. The adversary complaint did not describe the source of the underlying debt to Huebner. At trial, Huebner's counsel argued that Humphrey is liable on the state-law claims that Huebner brought in the underlying state court litigation. In state court, Huebner brought claims for breach of contract, intentional misrepresentation, statutory theft-by-fraud under Wis. Stats. §§ 895.446 and 943.20(1)(d), and violation of Wis. Stat. § 100.18. To prevail on his nondischargeability claim, Huebner must prove that Humphrey is liable under one of these causes of action *and* that the debt is non-dischargeable under the standard in § 523(a)(2)(A).

### I.

The Court first reviews the elements of each of Huebner's state-law claims. The elements of any breach of contract claim are (1) the existence of a contract between the plaintiff and the defendant; (2) breach of that contract; and (3) damages. *Pagoudis v. Keidl*, 2023 WI 27, ¶ 12, 406 Wis. 2d 542, 988 N.W.2d 606. However, it is not clear what contract Huebner claims that Humphrey breached. Huebner may have a breach of warranty claim, which includes the

additional elements of (1) an affirmation of fact; (2) inducement to the buyer; and (3) reliance by the buyer. *Id.* "When a warranty is found to be part of a contract, false representations made as part of the warranty are a breach of the contract." *Id.* As the Wisconsin Supreme Court noted in *Pagoudis*, it is unclear whether misrepresentations in an RECR can serve as the basis for a breach of warranty claim because the form itself declares that the RECR is "not a warranty of any kind." *Id.* ¶ 30 n.13. *See also* Ex. 1 at 1; Wis. Stat. § 709.03.

To establish an intentional misrepresentation claim under Wisconsin law, the plaintiff must show: "(1) that the defendant made a representation of fact to the plaintiff; (2) the representation was false; (3) the plaintiff believed and relied on the misrepresentation to the plaintiff's detriment; (4) the defendant made the misrepresentation knowingly or recklessly; and (5) the defendant did so intending to deceive and induce the plaintiff." *Pagoudis*, 2023 WI 27, ¶ 13.

Statutory theft-by-fraud operates as a combination of Wis. Stats. §§ 895.446 and 943.20(1)(d). Section 943.20(1)(d) makes it a crime to "[o]btain[] title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made," and section 895.446(1) provides a civil cause of action to anyone "who suffers damage or loss by reason of intentional conduct" prohibited by § 943.20. Wis. Stat. §§ 943.20(1)(d), 895.446(1). The elements of the claim are "(1) that the defendant made a false representation to the plaintiff; (2) the defendant knew the representation was false; (3) the defendant intended to deceive and defraud the plaintiff; (4) the plaintiff was deceived; (5) the plaintiff was defrauded; and (6) the defendant obtained money through the sale of property to the plaintiff." *Pagoudis*, 2023 WI 27, ¶ 15.

9

The elements of a false advertising claim under Wis. Stat. § 100.18 are: "(1) the defendant made a representation to the public with intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; and (3) the representation caused the plaintiff a pecuniary loss." *Pagoudis*, 2023 WI 27, ¶ 16 (citing *K&S Tool & Die Corp. v. Perfection Mach. Sales Inc.*, 2007 WI 70, ¶ 19, 301 Wis. 2d 109, 732 N.W.2d 792). Representations made to a single person can constitute "the public" for purposes of satisfying the first element. *See Malzewski v. Rapkin*, 2006 WI App 183, ¶ 25, 296 Wis. 2d 98, 723 N.W.2d 156 (failure to disclose defects on the RECR may be a violation of § 100.18). Reliance in fact is required to prove a false advertising claim, but that reliance need not be reasonable. *Id.* ¶ 24.

## II.

In addition to establishing that Humphrey owes a debt under one of the state-law causes of action discussed above, Huebner must also prove that any such debt is nondischargable. To except a debt from discharge under 11 U.S.C. § 523(a)(2)(A), "a creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010). "Justifiable reliance is a less demanding standard than reasonable reliance; it requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Id.* at 717 (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)). Under the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been readily apparent. *Field v. Mans*, 516 U.S. 59, 70-71 (1995). Justifiable reliance is not an objective standard, but one "determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Ojeda*, 599 F.3d at 717.

## III.

Huebner and Tatum testified to four areas in the house they purchased from Humphrey that experienced water issues after closing – (1) the living room ceiling, (2) the northwest corner of the basement in the unfinished section, (3) the southeast corner of the basement in the finished section, and (4) the kitchen dinette ceiling.

### A. Living Room Ceiling

The only evidence presented at trial regarding the alleged water intrusion in the living room ceiling was a photograph of a crack and stain on the ceiling taken well after closing, *see* Ex. 13, and Tatum's testimony that she first noticed the stain on the ceiling in the spring or summer of 2023. The Festge inspection report makes no mention of the crack or stain, and Huebner, Tatum, Humphrey, and Griffin all testified that they did not notice any staining on any ceiling in the house before closing. Huebner also did not present any evidence of the cause of the stain.

The Court finds that Huebner did not prove that Humphrey had knowledge of any defect related to the crack or water stain in the living room. Without evidence of the cause of the issue or evidence that the crack or water stain was even present before closing, Humphrey cannot have known that there was a defect that should have been disclosed on the RECR. Huebner must demonstrate that Humphrey had knowledge to succeed in proving that any debt owed to him is nondischargeable under § 523(a)(2)(A). Therefore, any debt related to misrepresentations in connection with any defect in the living room ceiling is dischargeable.

### B. Northwest Corner of Basement

Huebner and Tatum testified that they experienced water intrusion in the northwest corner in the unfinished side of the basement shortly after closing. They contend that Humphrey must have had knowledge of the leaking because they noticed the water so soon after closing.

The Court finds that Huebner did not sufficiently prove that Humphrey had knowledge of any water intrusion in the unfinished side of the basement.

The unfinished side of the basement is depicted in pictures in the top row on page 49 and on page 52 of the Festge inspection report. Ex. 3 at 52. Those pictures show, and Huebner's testimony at trial confirmed, that Humphrey stored personal items, including clothing, directly on the basement floor in the unfinished area of the basement. If Humphrey knew that the unfinished side was prone to water intrusion, it seems unlikely that Humphrey would store her personal items in that area where they would almost certainly be damaged. Humphrey's lack of knowledge defeats Huebner's nondischargeability claim on this issue.

The Court further finds that, even if Humphrey had knowledge of water intrusion on the unfinished side of the basement, any reliance by Huebner on Humphrey's statement on the RECR was not justifiable as required to support a claim under § 523(a)(2)(A). If a plaintiff "has discovered something which should serve as a warning that he is being deceived," the plaintiff "is required to make an investigation of his own." *See Field*, 516 U.S. at 71 (quotation omitted).

For example, in *In re Steinberg*, 270 B.R. 831 (Bankr. E.D. Mich. 2001), the plaintiffs were advised by their home inspector to obtain a disclosure from the prior occupants regarding water in the basement. *Id*. at 835. They did not do so, and the court concluded that their failure to do so "disables them from claiming that they justifiably relied on defendant's silence when they bought the subject residence." *Id*. at 837. Similarly, in *In re Satterfield*, No. 20-1061, 2021 WL 6549911 (Bankr. N.D. Ind. June 29, 2021), an inspector warned the plaintiff of potential defects in the home's support beams and recommended he obtain a pest inspector, but the plaintiff chose to forego further inspection and purchased the property anyway. *Id.* at *2. The court held that any debt was not dischargeable: "Much like being shown a one-eyed horse after

12

being told it is sound, the court cannot find that any reliance upon the defendants' falsehoods was justifiable given the information contained in the inspection report." *Id.*

Wisconsin courts have also held that a purchaser who is made aware of a potential defect cannot claim that the seller misrepresented the condition of the property. In *Malzewski v. Rapkin*, 2006 WI App 183, 296 Wis. 2d 98, 723 N.W.2d 156, the seller disclosed that "there might be a little seepage in the walls/floors" in the basement during heavy rain, but the purchasers elected not to have the basement inspected before the sale. *Id.* ¶¶ 2-4. The court held that the purchasers could not recover for misrepresentation because "[h]aving waived their right to have the Rapkins' home inspected before closing on the property, . . . the Malzewskis' reliance on the Rapkins' Real Estate Condition Report was unreasonable as a matter of law." *Id.* ¶ 14.

The Festge inspection report specifically notes dark staining in the northwest corner of the basement. Ex. 3 at 52. Festge explained that it was "[e]vidence . . . of past water seepage" and recommended that Huebner "[c]ontact a foundation contractor." *Id.* Festge noted "signs of possible microbial growth in the basement" and recommended that Huebner "[c]ontact a qualified mold remediation contractor." *Id.* Festge also recommended that Huebner "[c]onsult owner to confirm a dry basement." *Id.* at 49. The dark stains and evidence of past water intrusion were pictured in the inspection report and were visible without the need to move any of Humphrey's personal property. *See* Ex. 3 at 49, 52. After obtaining the inspector's warnings and recommendations, Huebner was on notice of the need to investigate further. He could not justifiably rely on the RECR as proof there were no leaks in the basement.

### C. Southeast Corner of Basement

The Court finds that Huebner did not present sufficient evidence at trial to establish that Humphrey had knowledge of water intrusion in the southeast corner on the finished side of the

13

basement. Though Huebner and Tatum testified to water intrusion in the first few weeks after closing, they also testified that the basement was not damp or musty when they toured the property before submitting the offer to purchase or with the home inspector. Humphrey testified to hosting gatherings of friends and family in the basement. The inspection report indicates that she had personal property and furnishings in the finished part of the basement, which would be damaged if the basement leaked. *See* Ex. 3 at 49. It seems unlikely that Humphrey would have left those items in the basement if she knew that they could be damaged.

In addition, there was no evidence that the carpet, drywall, or trim had any water damage before closing. Vorbau testified that water had been dripping down the concrete wall behind the drywall for many years, but he did not say whether there would have been enough water to seep under the drywall and make the carpet wet. He agreed that it was possible water was dripping without penetrating the drywall, and he said that he would have expected to see damage on the drywall, trim, or carpet if water had been leaking under the drywall and into the room. There was no evidence at trial suggesting that the drywall, trim, or carpet had been recently replaced. These facts lead to the conclusion that water may have been seeping down the wall without seeping under the drywall and trim. The Court concludes that Huebner did not submit sufficient proof that Humphrey had knowledge that water was dripping behind the drywall.

The Court further finds that, even if Humphrey had knowledge of water intrusion on the finished side of the basement, any reliance by Huebner on Humphrey's statement on the RECR was not justifiable as required to support a claim under § 523(a)(2)(A). The Festge inspection report specifically warned Huebner and Tatum that the grading of the concrete walkway at the exterior of the house would cause water to sit against the foundation could potentially cause leaks in the basement. Ex. 3 at 11. Festge specifically stated, "[i]f not corrected damage, leaks

and/or safety hazards may exist." *Id.* He recommended that Huebner have a "professional evaluate/repair as needed." *Id.* Huebner even recalled discussing this specific issue with Festge during the inspection. Despite this discussion, Huebner did not request that Humphrey repair the issue, nor did he seek further evaluation to determine whether the issue was in fact causing water to penetrate into the basement.

Huebner had knowledge of the potential that the grading issue on the exterior of the southeast corner would cause leaks inside the house, so he cannot prove that he justifiably relied on Humphrey's statements in the RECR as required for his claim under § 523(a)(2)(A).

### D. Kitchen Dinette

The Court finds that Huebner has proven the elements of a § 523(a)(2)(A) claim with respect to the leak in the kitchen dinette. The elements of § 523(a)(2)(A) overlap with the elements of Huebner's state-law claim for intentional misrepresentation. *See Cannon v. Johnson (In re Johnson)*, 661 B.R. 844, 852 (Bankr. W.D. Wis. 2024). The standard of proof for the two claims is different, however. Huebner must prove the elements of his state-law misrepresentation claim by "clear, satisfactory, and convincing evidence." *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 52, 262 Wis. 2d 32, 662 N.W.2d 652. Nondischargeability claims under § 523(a) require proof by a preponderance of the evidence. *Ojeda*, 599 F.3d at 716. The Court concludes that the proof of the elements was sufficient under the "clear, satisfactory, and convincing evidence" standard, so satisfaction of the elements for both claims demonstrates the underlying debt and the nondischargeability of the debt. Satisfaction of the same elements is also sufficient to prove the existence of a debt for violation of Wis. Stat. § 100.18. Because Huebner proved the existence of a debt for intentional misrepresentation and for violation of Wis. Stat. § 100.18, the Court does not address whether Huebner also proved that Humphrey owes a debt pursuant to his breach of contract and statutory theft-by-fraud claims.

To prove that Humphrey made a false representation with respect to the kitchen dinette, Huebner must prove that Humphrey had knowledge of the issue. Based on the evidence presented at trial, and on the demeanor of the witnesses, the Court finds that Humphrey did have knowledge that there was an issue causing water to leak above the ceiling in the kitchen dinette area.

The videos that Tatum took on June 15 and July 11, 2022 show significant leaking through the ceiling. Huebner did not present direct evidence of the cause of the leak over the kitchen dinette, but Tatum testified that she applied foam to the seams above the windows and roof in that area and that there have not been any further leaks since she performed that repair. This is sufficient circumstantial evidence that the cause of the leak was that the seal between siding and the roof area over the kitchen dinette "bump-out" area was damaged or degraded. Tatum's application of material to repair the seam fixed the issue and stopped the leak. With a leak caused by a degraded or damaged seal between the siding and the roof, it is unlikely that such significant water penetration would occur on the first such incident. Rather, it is far more likely that there was a small leak that progressed over time into a larger leak.

For this reason, the Court finds that Humphrey's testimony that she saw no stains, experienced no leaks, and did not paint or otherwise repair the kitchen walls or ceiling is not credible. All witnesses testified that there was no such staining before the closing. Both Huebner and Tatum testified that the ceiling in that area appeared to be freshly painted; Tatum described it as "pristine." Tatum testified that the ceiling had been repaired at some point, and that the repair was extensive, covering the width of the ceiling. Leaking caused by a damaged or ineffective seal over the bump-out would have produced *some* evidence of water damage before water started pouring into the house, such as staining on the ceiling. The Court therefore finds

16

Case 23-02112-rmb    Doc 25    Filed 09/30/24    Page 16 of 19

that the repair was done while Humphrey owned the property for the purpose of covering water damage and/or staining.

Humphrey was aware that there was a water issue above the kitchen dinette ceiling, and the Court concludes that Humphrey made a false representation when she answered "No" in response to question B11 on the RECR, which asked: "Are you aware of basement, window, or plumbing leaks, overflow from sinks, bathtubs, or sewers, or other ongoing water or moisture intrusions or conditions?" Because the false representation was based on Humphrey's knowledge, the falsity of the representation also satisfies the element that requires the false representation be made knowingly or recklessly.

The Court finds that Humphrey intended to deceive Huebner through her representation. Due to the nature and source of the leak, Humphrey must have seen water staining or damage during the five years that she owned the property. The evidence that the ceiling was freshly painted and had been repaired in the recent past suggests that Humphrey knowingly repaired water damage with the intent of concealing the water issues from the buyer of the property.

Finaly, the Court finds that Huebner relied on the false representation. The inspection report noted that the "[s]iding/trim appears to have issues" and that "moisture seepage/damage may result." Ex. 3 at 12-13. Festge recommended that that Huebner have a "professional evaluate further and repair as needed." *Id.* The report also noted that the roof "appears wavy in areas" and recommended that he "[c]onsult professional roofer as needed to confirm cause/condition." *Id.* at 18. Festge's notes were accompanied by pictures of the kitchen dinette "bump-out" area.

The Court concludes, however, that the inspection report was not sufficient to put Huebner on notice of the degraded or damaged seal above the bump-out. The picture

17

accompanying the siding note points to the siding on the second floor of the house, well above the bump-out. *Id.* at 13. Huebner and Tatum did not replace or repair the siding on the house after they experienced the leak. Therefore, if the cause of the leak was the siding, then Tatum's foam repair at the seam right above the bump-out would not have stopped the leak. Similarly, the couple did not repair the roof or shingles on the bump-out, so the "wavy" roof could not have been the reason for the leak. The Court concludes that the inspection report did not give Huebner and Tatum notice that there was a defect in the seal between the siding and the roof that was causing or could cause water problems in the kitchen dinette area. *See In re Lyon*, No. 18-32190-PCM7, 2022 WL 981594, at *6 (Bankr. D. Or. Mar. 31, 2022) (buyers justifiably relied on seller's representations where defects were known to seller but not obvious to buyers).

Huebner and Tatum testified that they would not have purchased the house if they were aware of the several defects they claim. Their testimony relates to all of the water problems but, as discussed above, several of them are not actionable. Therefore, it is not clear if they would have canceled the purchase had they been aware of only the water problem in the kitchen dinette.

They also testified that they would have asked Humphrey to perform additional pre-closing repairs or would have adjusted the price that they offered for the house if they had known about the issues. The Court finds that this is sufficient to establish that they relied on Humphrey's answer to question B11 to their detriment. It is also sufficient to establish that Humphrey's false representation caused pecuniary loss for purposes of Huebner's Wis. Stat. § 100.18 claim.

Huebner elected not to present evidence of the quantum of his damages at trial. He instead asked the Court to determine only that a debt exists and that the debt is non-

18

dischargeable. With that determination, Huebner may return to state court to liquidate his damages.

## CONCLUSION

In sum, the Court concludes that Huebner did not prove Humphrey is liable to him for her alleged misrepresentations related to water problems in the living room ceiling, the northwest corner in the unfinished side of the basement, or the southeast corner of the finished side of the basement. The Court concludes that Humphrey is liable to Huebner for intentional misrepresentation and for violation of Wis. Stat. § 100.118 for her misrepresentation on question B11 on the RECR as it relates to the water problem in the kitchen dinette ceiling, and that the resulting debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). The Court will enter a separate order and judgment consistent with this decision.

Dated: September 30, 2024

*Rachel Blise*

Rachel M. Blise
U.S. Bankruptcy Judge